**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SAMSUNG ELECTRONICS AMERICA, INC.,** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO. 3:15-CV-04108-D** |
| **YANG KUN "MICHAEL" CHUNG, THOMAS PORCARELLO, YOON-CHUL "ALEX" JANG, JIN-YOUNG SONG, ALL PRO DISTRIBUTING, INC.,** | § § § § § § | |
| **Defendants.** | § § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff Samsung Electronics America, Inc. ("Samsung" or "Plaintiff") files this Third Amended Complaint against Defendants Yang Kun "Michael" Chung ("Chung"), Thomas Porcarello ("Porcarello"), Yoon-Chul "Alex" Jang ("Jang"), Jin-Young Song ("Song") (collectively, the "Employee Defendants"), and All Pro Distributing, Inc. ("All Pro"), and in support thereof, would respectfully allege as follows:

## I.

## PRELIMINARY STATEMENT

This action arises based upon a conspiracy involving Samsung employees and Samsung's business partners to defraud Samsung. All Pro – an authorized Samsung distributor – is a company involved in the business of distributing Samsung parts. All Pro has wrongfully paid bribes and kickbacks to certain Samsung employees who formerly were involved in the

management and sale of Samsung parts, including Chung, and possibly others, in exchange for special, improper benefits that came at the expense of Samsung.

The conspiracy was vast and multi-faceted, and involved an array of complex efforts to wrongfully benefit Defendants at Samsung's expense. One aspect of the conspiracy, however, was simple – All Pro would provide Samsung employees with benefits, including large cash payments, and in return, those employees wrongfully provided All Pro with parts at extremely discounted prices, and in some instances, for *free*. All Pro then could sell those parts on the gray market at artificially low prices, significantly undercutting Samsung, while still turning a profit.

In another aspect of the conspiracy, certain of the Employee Defendants engaged in auction rigging. Samsung, concerned that it was not realizing maximum profits on the sale of its parts, mandated the implementation of an auction system in an effort to increase competition and raise profits in connection with the sale of parts. The conspirators, however, merely recalibrated their scheme to work around the auction process. More specifically, All Pro paid kickbacks to Chung and others to rig the auction process, allowing All Pro to essentially steal Samsung parts by acquiring them at deeply discounted prices in a non-competitive auction process. Porcarello, meanwhile, steered Samsung to hire an auctioneer to run an online auction to sell excess Samsung parts while Porcarello was secretly being paid by the auctioneer.

The Employee Defendants' various rogue efforts to sabotage their employer did not stop there. Porcarello also operated a secret side business offering and selling misappropriated Samsung parts to third parties. For Chung, it was not enough to merely sabotage his own employer. While shirking his duties of loyalty to Samsung, Chung assisted in the distribution channel for iPhone parts in exchange for bribes – indirectly benefitting a competitor of Samsung's in the telecommunications space.

The net effect of the wrongful scheme was severely detrimental to Samsung for any number of reasons.  As an initial matter, the diversion of Samsung parts at improperly discounted prices, and distribution of counterfeit devices, allowed All Pro to make a profit on such sales, while significantly undercutting Samsung. By bribing Samsung's employees, All Pro received the goods at improperly discounted prices.  All Pro was then able to distribute the goods at artificially low prices, while still turning a substantial profit.  Samsung, meanwhile, was deprived of reaping the benefits of its substantial capital expenditures.

Despite their obligations of trust and confidence, the Employee Defendants betrayed their fiduciary obligations to Samsung for their own gain and to the severe detriment of Samsung.  By this Complaint, Samsung seeks redress for the substantial harm incurred as a result of Defendants' unlawful conduct.

## II.

## PARTIES

### A.   Plaintiff

1.      Plaintiff Samsung Electronics America, Inc. ("Samsung") is a New York corporation with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

### B.   Defendants

2.      Yang Kun "Michael" Chung ("Chung") is an individual and a resident of the State of Texas.  Chung has been served and made an appearance in this matter.

3.      Thomas Porcarello ("Porcarello") is an individual and a resident of the State of Texas.  Porcarello has been served and made an appearance in this matter.

4.      Yoon-Chul "Alex" Jang ("Jang") is an individual and a resident of the State of Texas.  Jang has been served and made an appearance in this matter.

5.      Jin-Young Song ("Song") is an individual and a resident of the State of Texas.  Song has been served and made an appearance in this matter.

6.      All Pro Distributing, Inc. ("All Pro") is a foreign corporation duly formed and existing under the laws of the State of California.  All Pro has, at all times material to this action, engaged in business in Texas, as more particularly described below, but is not required to, and does not, maintain a designated agent in the State of Texas on whom service of citation may be made in this action.  The causes of action asserted herein against All Pro arise from, or are connected with, purposeful acts committed by All Pro in Texas.  All Pro has been served and made an appearance in this matter.

### III.

### JURISDICTION AND VENUE

7.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 17 U.S.C. § 1203 because Samsung's claims for violations of the United States Trademark Act, Title 15 of the United States Code, arise under federal law.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Samsung's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.  Jurisdiction in this Court is also proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy is in excess of $75,000.

8.      Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Northern District of Texas, Dallas Division, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the Northern District of

Texas, and the Court has personal jurisdiction over Defendants.  Venue is also proper in this Court because certain of the applicable agreements under which this action arises designate federal or state courts sitting in Dallas County, Texas as the venue for any disputes relating to such agreements.

9.       Defendants are subject to the personal jurisdiction of this Court pursuant to Tex. Civ. Prac. & Rem. Code § 17.042 because Defendants do business and/or reside in Texas, breached contracts that were to be performed, in whole or in part, in the State of Texas, and committed tortious acts within the State of Texas.

## IV.

## RELEVANT FACTUAL BACKGROUND

### A.       Samsung And Its Affiliates

10.       Samsung is a wholly owned subsidiary of Samsung Electronics Co., Ltd. ("Samsung Ltd."), a Korean company.

11.       In January 2015, Samsung merged with another wholly-owned subsidiary of Samsung Ltd., Samsung Telecommunications America, LLC ("Samsung Telecom").  The merger combined Samsung Ltd.'s two main consumer facing U.S. businesses, Samsung and Samsung Telecom, into Samsung. Samsung commercializes, markets, and sells a variety of electronics products in the U.S., including cellular telephones, tablets, and wearables, as well as home appliances and consumer electronics.  Samsung also sells parts to be used in connection with the servicing and refurbishing of Samsung mobile devices.

12.       As a fundamental part of its business, Samsung Telecom enters into agreements with third-party servicers and distributors such as All Pro.  These contracts set forth the terms and conditions of the business relationship between Samsung Telecom and its business partners.

Importantly, however, these contracts also set forth restrictions and limit the vendors' scope of services.

**B.    The Employee Defendants Were Former Samsung Employees Engaged In The Management and Sale of Samsung Parts.**

    **(i)    Michael Chung**

13.    In or around October 2011, Chung was hired by Samsung Telecom as the Director of Reverse Logistics, SMC Parts Management.  Chung resigned from employment on September 25, 2015.  At the time of his resignation, Chung was the Senior Director of Service Operations.

14.    Chung's responsibilities to Samsung included operations related to the reuse of Samsung products. Chung was responsible for the management and the sale or resale of surplus as well as returned Samsung products and parts.  In this role, Chung had a very close relationship with distributors like All Pro.

    **(ii)    Thomas Porcarello**

15.    Porcarello was originally hired by Samsung Telecom as an Inventory Control Manager in or about August 2011.  In this role, Porcarello was entrusted with evaluating parts suppliers, and managing, purchasing, and tracking parts. Porcarello was responsible for ensuring the company had the right amount of product to meet its customers' needs and also to avoid overstocking items which ties up cash and creates storage issues.

    **(iii)    Yoon-Chul "Alex" Jang**

16.    Jang was hired in July 2007 as a contractor and was shortly thereafter converted to a full time employee of Samsung Telecom.  Jang recently held the position of procurement manager and reported to Chung. Generally, Jang worked on the service side, repairing parts and phones.

(iv)      **Jin-Young Song**

17.      Song was hired by Samsung Telecom on March 26, 2012, and resigned October 5, 2015.  Song served as the Repair Operations Specialist in the Repair Operations department.

**C.      The Employee Defendants Contractually Agreed to Act in the Best Interest of Samsung.**

18.      As part of their employment, the Employee Defendants acknowledged and agreed to be bound by Samsung Telecom's policies and procedures.  These policies, included, but were not limited to the following agreements:  (1) Confidentiality and Inventions Employee Agreements; (2) the Employee Handbook; (3) Information Technology Use of Company Resources Policy; (4) Information Security Pledge; (5) the Samsung Compliance Program and Code of Conduct; (6) Nondisclosure Agreements; and (7) Acknowledgement of Anti-Trust Training (the "Employment Agreements").

19.      The Employee Defendants executed acknowledgments, agreeing to follow the policies and procedures set forth in Samsung Telecom's Employee Handbook ("Handbook").  The Handbook provides, in relevant part that, "[a]s an STA [Samsung Telecom] employee, you are expected to act at all times in the best interest of STA and to exercise sound judgment unclouded by personal interests or divided loyalties.  Both in performing your duties at STA and in your outside activities, you should avoid the appearance as well as the reality of a conflict of interest."

20.      According to the Handbook, "A conflict of interest exists if your circumstances would lead a reasonable person to question whether your motivations are aligned with the best interests of STA.  If for example, you are involved in an outside activity or have a financial or other personal interest that might interfere with your objectivity in performing company duties and responsibilities, you may have a conflict of interest."

21.     The Handbook provides examples of "some of the most common conflict-of-interest situations." Included in the list of examples are the following, which are particularly applicable in this matter:

- A personal financial transaction or relationship with a client, market, prospect, supplier[,] agent or competitor of STA.
- Employees may not directly or indirectly benefit, or seek to benefit, from his or her position as an employee of STA from any sale, purchase or other activity of STA.
- Employment Outside of STA – Moonlighting.
- Kickbacks and Rebates by Vendors.
- Gifts from Vendors or Customers Outside Activities.

22.     Pursuant to the Handbook, employees must make "prompt and full disclosure in writing to STA's Corporate Compliance Committee of any situation that may involve a conflict of interest."

23.     The Handbook also requires Samsung to create and maintain accurate books and records. In particular, the Handbook provides that, "Dishonest reporting or failure to disclose information that by law or contract must be disclosed, is prohibited and could lead to civil or criminal liability."   According to the Handbook, "This includes reporting information or organizing the information in a way that is intended to mislead or misinform recipients, whether inside or outside STA.  *Employees found to be making inaccurate and/or misleading reports will be subject to discipline up to and including immediate termination and possible legal prosecution.*" [Emphasis added.]

24.     Samsung's Handbook also provides that purchases of products and services will be "based on merit." Of particular significance, the Handbook states:

Kickbacks, Rebates and Gifts – Purchases of goods and services must not lead to employees or their friends or families receiving personal kickbacks or rebates.   Associates  and  their  immediate  family  may  accept  only

infrequent meals, entertainment or gifts of a reasonable value from vendors or suppliers.

25.     In addition to the Handbook, Samsung maintains additional policies and procedures, including a Conflicts of Interest Procedure and Policy ("Conflicts Policy") and Prohibition of Fraud and Bribery Procedure ("Fraud and Bribery Policy").

In pertinent part, the Conflicts Policy provides:

STA **prohibits** its employees from engaging in any of the following activities without the prior written consent of the employees supervisor, STA's General Counsel, and the Chief Executive Officer....  Giving, soliciting or accepting gifts, favors, loans or other benefits or preferential treatment (other than business related meals and entertainment [as defined in Conflicts Policy] and non-nominal gifts [as defined in Conflicts Policy]) from any person or entity that does business or seeks to do business with STA.  Under this policy, it is never permissible, and may even be unlawful, for an employee to provide, solicit, demand, or accept anything of tangible value, such as a gift, benefit or favor, with the intent of being influenced or rewarded in connection with any STA business or transactions. REGARDLESS OF ANY GUIDELINES SET FORTH IN THIS POLICY, STA'S BUSESS (sic) AND ETHICS GUIDELINES OR ANY OTHER STA POLICY, IT IS THE POLICY OF STA TO PROHIBIT AN EMPLOYEE FROM OFFERING OR RECEIVING OF (sic) ANY GIFT, FAVOR, GRATUITY OR ENTERTAINMENT THAT DOES, OR MIGHT BE PERCEIVED TO, UNFAIRLY INFLUENCE ANY STA BUSINESS INTERACTION. [Emphasis in original.]

26.     With respect to Samsung's Fraud and Bribery Policies, it states, "we expect and demand that each of [Samsung's] employees refrain from participating in any fraud, offering or paying and bribes or receiving or requesting any kickbacks."

**D.     All Pro Was An Authorized Distributor of Samsung Parts.**

27.     All Pro was an authorized distributor of Samsung parts. All Pro was incorporated on August 31, 2000, in the State of California.  The company's governing person is Shachar Shabtay ("Shabtay").

28.     In March 2008, Samsung Telecom and All Pro entered into an agreement for the Terms and Conditions of Sale Service Parts, whereby Samsung Telecom would sell phone parts to All Pro.   In February 2011, the parties entered into a Distributor Agreement, whereby Samsung Telecom agreed to sell to All Pro, and All Pro agreed to purchase, certain products from Samsung Telecom.   Neither party could, without the prior written consent of the other party, use any of the other party's trademarks, trade names, corporate slogans or logos, or product designations for any purpose.   In addition, neither party acquired any rights to any trademark, trade name or logo of the other party.

29.     All Pro was expressly denied any license under any patents, copyrights, trademarks or trade secrets of Samsung Telecom.   The contract further prohibited All Pro from disclosing any of Samsung's confidential information.   Specifically, Samsung and All Pro agreed that they would only use such confidential information for the purpose of carrying out their respective obligations under the Distributor Agreement and likewise prohibited the unauthorized disclosure or dissemination of such confidential information.

30.     In March 2013, All Pro and Samsung Telecom entered into an Accessory Distributor Agreement whereby All Pro was authorized to sell accessory products to authorized Samsung retailers.   This contract prohibited unauthorized distribution of Samsung's products and prevented All Pro, without prior written consent, from using any of Samsung's trademarks. Moreover, All Pro was expressly denied any license under any patents, copyrights, trademarks or trade secrets of Samsung Telecom.   Specifically, All Pro is prohibited without the written consent of Samsung from using any of Samsung's trademarks, trade names, slogans or logos, not is All Pro permitted to knowingly do anything to materially infringe, impeach or lessen the value of Samsung's trademarks, patents, trade name or logo.

31.     The Accessory Distributor Agreement also prohibited All Pro from disclosing any of Samsung's confidential information. Accordingly, Samsung and All Pro agreed that they would only use such confidential information for the purpose of carrying out their respective obligations under the Distributor Agreement and likewise prohibited the unauthorized disclosure or dissemination of such confidential information.

32.     After the filing of this lawsuit, Samsung terminated the agreements referenced above. In contravention to its ongoing contractual obligations post-termination, All Pro violated the agreements and infringed Samsung's trademarks by continuing to hold itself out to the public and to its wholesale customers on its website, LinkedIn profile, and elsewhere that it is an authorized Samsung distributor when, in fact, it is not.  These agreements unequivocally state that, upon termination, All Pro ceases to be an authorized wholesale distributor of Samsung products and must remove all of Samsung's marks and brand names from its advertising.  All Pro is in violation of these provisions by continuing to misrepresent its status as an authorized wholesale provider of Samsung products.

**E.     Chung and Porcarello Wrongfully Provide Third Parties With "Build Kits," For The Purpose of Diverting Counterfeit Devices to All Pro.**

33.     From 2012-2014, Chung, Porcarello, and other Samsung employees wrongfully provided "build kits" to third parties.  The build kits contained ***all*** of the necessary component parts to assemble certain Samsung mobile devices. Included in the build kits were parts known as PBAs and OCTAs.

34.     PBAs are the brains of the mobile device, and contain Samsung's intellectual property.  Due to their critical importance to the device, Samsung does not permit PBAs to be sold on the open market.  Rather, old, obsolete, and irreclaimable PBAs are destroyed by Samsung.  Similarly, Samsung does not permit the sale of its OCTAs, which are the highly

technological touch screen components of the devices.  Samsung's OCTAs have a proprietary design and each one is emblazoned with the Samsung trademark, "SAMSUNG," across the top. Although not captured in the text herein, the trademark contains unique lettering – both in style, size, lines, and angles.

35.    PBAs and OCTAs are provided to Samsung's authorized service providers – free of charge – for the limited purpose of repairing damaged Samsung devices.  PBAs and OCTAs are never supposed to be provided – sold or otherwise – to distributors such as All Pro for sale on the open market.  However, All Pro, Chung, and Porcarello saw an opportunity to make money and circumvent their obligations to Samsung.  To maximize on this opportunity, All Pro, Chung, Porcarello, and a third party engaged in an unlawful scheme to (1) wrongfully acquire Samsung parts; (2) assemble the parts into counterfeit phones; and (3) sell them in the market. Accordingly, Chung and Porcarello improperly took all of the Samsung parts necessary to build a phone and sold them to the third party for less than fair market value.  The third party assembled the parts into counterfeit phones (bypassing Samsung's rigorous assembly protocols) and sold them to All Pro.  All Pro sold these assembled counterfeit phones to the market.  To compensate and induce Chung and Porcarello, All Pro bribed them, in strict contravention of their obligations to Samsung.

36.    Based on information and belief, component parts were ultimately assembled to make at least 16,318 counterfeit Samsung mobile devices that were sold with the Samsung trademark.

37.    Samsung spends considerable time and money hiring and training skilled workers to assemble its phones.  Additionally, Samsung has quality controls to ensure its phones live up to the quality known by the public from Samsung. The mobile devices that were assembled by

the third party and sold by All Pro did not have the same procedures, facilities, skilled and trained workers, equipment and technology to assemble the devices pursuant to Samsung's rigorous technical and quality specifications.

38.     The assembled phones contained Samsung's signature mark "Samsung;" however, the phones were not genuine Samsung phones because they were not assembled by Samsung pursuant to its rigorous specifications as previously stated.   Accordingly, these counterfeit phones likely caused confusion to the buyers because the marks and the parts within the phones led consumers to believe these were genuine Samsung phones that were assembled according to Samsung's rigorous conditions.

39.     On information and belief, to encourage the improper conduct by Samsung employees, All Pro bribed, paid kickbacks, made secret payments, and paid improper gratuities to Chung and possibly to the other Employee Defendants in order to induce the Employee Defendants to breach Samsung's policies and their duty of loyalty to Samsung.   By accepting such payments and gifts, these Employee Defendants violated Samsung's policies and procedures and breached fiduciary duties they owed to Samsung.

40.     All Pro knew that the Employee Defendants likely would be breaching Samsung Policies by engaging in this conduct because it is commonplace in the telecom industry for companies to have policies prohibiting an employee from acting against the company's interest. All Pro has been in the telecom industry for over fifteen years and its high level employees have substantial experience in the telecom industry.   Likewise, All Pro knew that Samsung requires a duty of loyalty to Samsung because All Pro and Samsung have entered into numerous contracts with one another requiring as much.   Specifically, All Pro, in its Distributor Agreement with Samsung, agreed that it would not disclose confidential or proprietary information belonging to

Samsung.  Therefore, All Pro knew that Samsung employed contractual provisions to ensure that Samsung information/equipment would not be used for unintended purposes.

41.     All Pro received these completed phones from the build kits, and upon information and belief, caused them to be sold and/or sold the counterfeit phones to others through interstate commerce, including, but not limited to:  (1) advertising online; (2) using the mail to effectuate transactions; and (3) using bank accounts/credit cards to facilitate such transactions.

42.     The Distributor Agreement with Samsung did not permit All Pro to distribute these phones.  Additionally, the Distributor Agreement only permitted All Pro to purchase from Samsung certain products at certain prices.  Contrary to its contractual obligations, All Pro (1) did not receive these phones from Samsung; (2) purchased phones in express contravention to the Distributor Agreement; (3) wrongfully and without permission used Samsung trademarks and logos; and (4) sold these counterfeit phones to unauthorized buyers.

43.     Chung has admitted that he has received two $5,000 payments totaling $10,000 from All Pro, the recipient of a majority of the build kits.

44.     Jang has admitted to accepting a used car valued at $4,400, a $600 gift card, and meals and entertainment on at least 55 occasions from Samsung Telecom vendors, and using a private jet for a personal vacation to Colorado that was provided by vendors.

**F.     Chung and Porcarello Designed an Auction Process for Disposing of Samsung Parts, But Rigged The Auction for Their Own Benefit and to the Detriment of Samsung.**

45.     In 2012, certain Samsung employees, including Porcarello and Chung, were involved in establishing an auction process to dispose of excessive, obsolete, and aged parts.

(i)        **Porcarello Rigs the Auctioneer Selection Process**

46.      Porcarello was responsible for identifying and proposing auction companies to run the Samsung parts auctions.  Unbeknownst to Samsung, Porcarello had a relationship with an online auctioneer, Global Auction Link ("GAL").

47.      GAL is owned by Intrinsic Technology Partners, Inc. ("Intrinsic").  Intrinsic has a business relationship with New Heights Marketing LLC ("New Heights") and Porcarello is the "Manager" for New Heights.   In an Outside Sales Contractor Agreement, dated February 17, 2009 (the "Intrinsic Agreement"), New Heights agreed to provide "Sales and Marketing Services" to Intrinsic, which are described as providing, among other things, "different types of internet auction services."   In return for providing services to Intrinsic, New Heights is paid: commissions equal to 28% of all Net Sales where New Heights facilitated the establishment of the relationship; and an override commission equal to 3% of all net sales for people New Heights introduces to Intrinsic and whom generate commissions for Intrinsic.   Porcarello executed the Intrinsic Agreement on behalf of New Heights.

48.      When Porcarello identified potential auctioneers that Samsung Telecom could hire to run the auctions, Porcarello included GAL on the list of potential auctioneers.  In addition to identifying potential auctioneers, Porcarello created an Online Auction Comparison Chart ("Chart").   The Chart purported to objectively compare three potential auctioneers: (1) Global Auction Link ("GAL"), (2) a third-party auction company, and (3) a to-be-created internally hosted procurement site.

49.      Given Porcarello's secret financial interest in GAL, not surprisingly, the Chart was not objective.  On the contrary, it was designed to ensure that Samsung Telecom hired GAL.  The Chart contained 63 criteria for evaluating the three potential auctioneers.  GAL satisfied all

63 of the criteria, including offering the most favorable capabilities.  The third-party auction company satisfied 21 of the criteria and the internal procurement site satisfied just 14.  Nowhere in the Chart did Porcarello disclose that he had a financial relationship with GAL.

50.     Porcarello prepared the request for proposal ("RFP") to hire GAL that was submitted to Samsung Telecom.  Porcarello failed to disclose his financial relationship with GAL in the RFP.   Ultimately, Chung selected GAL and, based on the rigged selection process, Samsung Telecom hired GAL to conduct its parts auctions.

**(ii)     Chung Rigs the Auction Process to Favor All Pro**

51.     The first auction for select mobile device parts was held in 2012.  Only All Pro participated in the auction.  All Pro's starting bid of $2,018.00 was also the winning bid.  In Samsung's second auction, All Pro was again the only vendor to participate, although other vendors accepted invitations to the auction.  In total, from 2012 to 2015, All Pro won approximately 60-70% of the auctions.

52.     Chung rigged the auction process to reduce the number of companies All Pro needed to compete against in order to win the parts auctions.  First, Chung instructed a subordinate to reduce the number of companies that were invited to participate in the auction from approximately 30 companies to just five, which included All Pro.  Second, Chung changed the criteria for who was allowed to participate in the auctions – Chung created the requirement that each customer participating in the auction needed to purchase at least $2 million in parts annually from Samsung.  Although All Pro satisfied this requirement, other auction participants did not.

53.     Chung imposed the $2 million purchase requirement because he did not want a specific customer bidding in the auctions because the customer was bidding on a regular basis

and driving up prices.  Although higher prices would have benefited Samsung Telecom, the customer's bidding activity was driving up costs for All Pro.  Accordingly, Chung instructed a subordinate to enforce the $2 million purchase requirement and kick out the customer, and any other bidders that failed to satisfy the requirement.  The subordinate was shocked that Chung would cut off the customer from participating in the auctions and concluded the process for selecting auction participants was unethical.

54.    In addition to reducing All Pro's competition in the auctions, Chung, on information and belief, also provided All Pro with Samsung's confidential information during the auctions.

55.    More specifically, Chung, with assistance from Porcarello and others, provided the following confidential information: (1) providing advance information to All Pro regarding the types of parts coming up for auction before the part descriptions were formally circulated to the potential bidders; and (2) informing All Pro of bidding information relating to other bidders.  This confidential information not only permitted All Pro the ability to determine Samsung's pricing, but it also allowed All Pro to pre-sell the parts it bought at auction, thereby eliminating its risk and undercutting the market and the profit Samsung made on the parts auctions.

56.    The identity of bidders is known only to Samsung as well as the parts comprising the lots that are to be auctioned.  Additionally, the minimum bid is set exclusively by Samsung based on its own method of calculation.

57.    Chung's actions reduced the number of bidders and allowed All Pro to win more auctions and at lower prices.  Conversely, the lack of competition, and resulting lower prices for parts sales, cost Samsung Telecom significant sale proceeds that it otherwise was entitled to receive.

**G.**     **All Pro Provided Bribes and Kickbacks to the Employee Defendants.**

58.     To encourage the improper conduct described herein, All Pro bribed, paid kickbacks, and made secret payments to Chung and Porcarello.  By accepting such payments, the employees violated Samsung's policies and procedures and breached fiduciary duties they owed to Samsung.

59.     Chung has admitted that he has received two $5,000 payments totaling $10,000, from All Pro, the recipient of a majority of the build kits and the winner of the majority of the auctions.  As described in more detail below, Chung was also provided payments by a third-party company in connection with Chung's wrongful efforts to help that company obtain iPhone parts.

60.     Also, between 2009 and 2015, GAL's owner, Intrinsic, paid Porcarello, through New Heights, over $68,000 in commissions.  Porcarello received approximately $45,000 of those commissions between 2012 and 2015, after GAL had been hired by Samsung Telecom to run its parts auctions.

**H.**     **Extra OCTAs Included on Subcontract Purchase Orders and Missing OCTAs**

    **(i)**     **Song Doctored Subcontract Purchase Orders by Adding OCTAs to the Orders, Causing Samsung to Ship Extra OCTAs to Vendors for Free**

61.     From January 2012 to about September 2015, Song and other Samsung employees improperly added 64,000 OCTAs to subcontract purchase orders ("POs") issued for parts sent to various Samsung vendors.

62.     Subcontract POs reflect parts needed by the vendors to perform warranty-related repairs on certain mobile devices and reclaim OCTAs.  Samsung staff created the subcontract POs based on information provided by the vendors relating to the parts the vendors needed to make the repair – repair the mobile devices and/or reclaim the OCTAs.  Specifically, subcontract POs are supposed to reflect only the actual parts needed for repairs and OCTA reclamation.

63.     Song and other Samsung employees, however, doctored subcontract POs by adding OCTAs to the subcontract POs, causing Samsung to pull the extra OCTAs from inventory and ship them to the vendors.  Because the OCTAs were included on subcontract POs for parts related to warranty repairs and reclamations, the vendors did not pay for the extra OCTAs.  Instead, the vendors received them free of charge.

64.     As a result of the doctored subcontract POs, Samsung needlessly shipped over 60,000 OCTA to certain vendors. The OCTAs included on the doctored subcontract POs and ultimately shipped to the vendors included Grade A (new) and Grade R (reclaimed) OCTAs. Due to the missing and lost OCTAs, Samsung suffered losses in excess of $4.2 million.

65.     The vendors, on the other hand, benefited financially from receiving the extra OCTAs.  Specifically, based on information and belief, the vendors responsible for reclamation received Grade A and Grade R OCTAs, that they simply returned to Samsung as "reclaimed" and sought compensation for purportedly reclaiming them when, in fact, no work was needed to be performed because the OCTAs were either new or had already been reclaimed.  The extra OCTAs also appear to have been used to enhance the reclamators' performance indicators, *i.e.*, increase the percentage of successfully reclaimed OCTAs, which resulted in Samsung viewing the reclamators more favorably and directing further reclamation business to them.  In addition, based on information and belief, vendors are believed to have sold the extra OCTAs or used them in China in connection with these actions.

66.     Song has admitted that he added OCTAs to subcontract POs.  Song personally altered subcontract POs – adding almost 49,000 extra OCTAs.  These OCTAs were removed from Samsung inventory and shipped to the vendors, at no cost to the vendors.   Song admitted

that he added the OCTAs to the subcontract POs in order to reduce excess parts in his repair department and thereby enhance his potential bonus at Samsung.

67.     Song has admitted to accepting payments from executives of third-party vendors.  In July 2012, he accepted a white envelope containing cash from an executive of a third-party vendor, which Song claims was a wedding gift.  In or around December 2014, Song accepted another $300 from the executive, which Song claims was a gift for the birth of his child.  Song also admitted that once or twice a year he accepted a carton of cigarettes from another executive.

I.     **Porcarello Operated a Secret Side Business Selling Phones and Parts Away From Samsung.**

68.     In addition to his participation in the scheme described above, Porcarello also operated a secret side business selling misappropriated Samsung parts and mobile devices of competitors.  To conceal his secret side business, Porcarello used a personal email address, tpork11@gmail.com, and cautioned customers of his side business to only use his personal email address and to be vague in texts because, you "Never know who is watching."  Other times, he advised customers not to "make any noise," and, "Whatever you do, please do not pass this along or discuss with anyone until we talk."

69.     On November 19, 2013, Porcarello wrote an email to an executive with Ace Wireless Group ("Ace") "regarding "I777."  Porcarello's email, which was sent from his personal email address, tpork11@gmail.com, stated, "I own 300 new 777 OCTA if interested. shhhhh. have initial offer for $50, if I can get them to close."  The Ace executive responded, "I can get broken devices from AT&T but they will only pay me $65 for the repair; we did the math and would need to pay at the most $40 per LCD.  Or if you want me to try and resell them to a

customer, I can find out what they would pay."   Porcarello emailed back stating, "Cant sell below $50.  Dont want to make any noise.  Dont do anything just yet.  Thanks."

70.     On January 14, 2014, Porcarello used his tpork11@gmail.com email account to send an email to this Ace executive stating, "Be very vague on text.  Or just use this email. Never know who is watching."  On January 21, 2014, Porcarello sent an email from his email account at Samsung, t.porcarello@sta.samsung.com, to his personal email address, tpork11@gmail.com. The email contained a sales sheet listing 132 phones, including the g2 D802, Nexus 5 D820, Nexus 4 E960, and Optimus G Pro E980, for a total sales price of $46,875. Porcarello then forwarded the email from his personal email account to a competing third party.  In the email, Porcarello inquired, "can you do anything with these? make sure you send to this email only…or call me with info.  Whatever you do, please do not pass this along or discuss with anyone until we talk."

71.     On January 22, 2014, Porcarello sent a follow up email to the Ace executive with new pricing.  The email lowered the total sales price for the 132 phones to $44,750.  That same day, the Ace executive emailed Porcarello inquiring about where to wire the money and how to pick up the phones. On January 23, 2014, Porcarello emailed the Ace executive wire transfer instructions for a bank in Southlake, Texas and an account in the name of "New Heights Marketing LLC, 1912 Cresson Drive, Southlake, Texas 76092, 817.808.8585."  As described above, Porcarello is a Manager of New Heights and 1912 Cresson Drive is Porcarello's home address.  In addition, between January 9, 2015 and February 10, 2015, Porcarello, using his personal email account, exchanged emails with the Ace executive regarding the apparent sale of phone chargers.

72.     Based on information and belief, Porcarello sold misappropriated Samsung parts (e.g., the "new 777 OCTA") without Samsung's authorization or permission.   The misappropriation of those parts harmed Samsung, while directly benefiting Porcarello. Moreover, Porcarello's operation of the secret side business conflicted with his duties and obligations to Samsung.

**J.      The Damage Done**

73.     As a result of the Employee Defendants' deliberate breaches of their contractual obligations and fiduciary duties to Plaintiff, as outlined above, and the conspiracy involving All Pro, Chung, Porcarello, and Jang to carry out that unlawful conduct, as outlined above, Plaintiff has been harmed.   By this action, Plaintiff seeks money damages as compensation for its resulting losses and injunctive relief aimed at preventing Defendants from inflicting further irreparable harm to Plaintiff and its business.

**V.**

**<u>CLAIMS</u>**

**A.      Count One:  Federal Trademark Infringement Under Sections 32(1) and 43(a) of The Lanham Act – 15 U.S.C. § 1114(a) and 15 U.S.C. § 1125(a)(1)(B); and Texas Trademark Infringement – Tex. Bus. & Comm. Code § 16.102 (Against All Pro, Chung, Jang, and Porcarello).**

74.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

75.     All Pro's, Chung's, Jang's, and Porcarello's conduct in diverting "build kits" as part of a conspiracy to sell and offer for sale counterfeit Samsung devices constitutes use of Samsung's trademarks without authorization in violation of Sections 32(1) and 43(a) of the Lanham Act, and in violation of Section 16.102 of the Texas Business and Commerce Code.  All Pro's use of the Samsung trademark without authorization also constitutes use of Samsung's

trademarks on its website and other mediums without authorization in violation of Sections 32(1) and 43(a) of the Lanham Act, and in violation of Section 16.102 of the Texas Business and Commerce Code.

76.     Section 32(1) of the Lanham Act protects against the use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods of services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §1114(1)(a). Section 43(a) of the Lanham Act likewise prohibits unfair competition with respect to registered and unregistered trademarks. 15 U.S.C. § 1125(a)(1)(A).  Texas trademark law is consistent with federal law, and the Lanham Act is considered persuasive authority for interpreting and construing the Texas statute. Tex. Bus. & Comm. Code § 16.001, *et. seq*.

77.     A plaintiff demonstrates a violation of the Lanham Act if it can show, first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion. A likelihood of confusion may result where a defendant uses a product that is similar to the plaintiff's product, but was not manufactured or distributed in accordance with the plaintiff's standards so that it is "materially different" or gives off a false sense of affiliation.

78.     The counterfeit devices constructed and distributed by these Defendants are materially different from Samsung's genuine phones because, among other things:   (1) the devices were not assembled pursuant to Samsung's rigorous quality control standards; (2) the applicable warranties have been altered; (3) the Samsung packaging has been altered or is otherwise not genuine; and (4) the phones are being sold under the fraudulent pretense that the phones were assembled by Samsung. Further, Samsung is protected from the unauthorized distribution of its products that do not meet its quality control standards because Samsung has

established and abides by legitimate quality control procedures, and the distribution of non-conforming products will diminish the value of Samsung's registered trademark.  Further, All Pro's use of Samsung's registered trademark on its website establishes a likelihood of confusion that All Pro is selling authorized Samsung products when in fact it is no.

79.     The sale of counterfeit Samsung devices by Defendants All Pro, Chung, Jang, and Porcarello has caused, and will continue to cause, a likelihood of confusion, mistake, and deception as to the source of the counterfeit devices. The actions of these Defendants in wrongfully constructing and distributing counterfeit devices which contain Samsung's registered trademarks has caused, and will continue to cause, irreparable damage to the business, reputation, and goodwill of Samsung.  Finally, Samsung has incurred significant damages as result of these Defendants' violations under the Lanham Act, and Samsung is entitled to relief.

80.     Because All Pro's, Chung's, Jang's, and Porcarello's conduct was undertaken knowingly, willfully, and deliberately, Plaintiff is entitled to recover exemplary damages and an award of lost profits, disgorgement of their ill-gotten gains, and attorneys' fees.

**B.     Count Two: Violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), Section 1962(c) (Against All Pro, Chung, Jang, and Porcarello).**

81.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

82.     By the conduct outlined above, Samsung has sustained injury to its business and property by reason of Chung, Jang, Porcarello and All Pro's RICO violations. Thus, Samsung has standing to bring a civil claim against these Defendants for violations of RICO.

**(i)     Elements Common to All RICO Claims**

83.     RICO makes it unlawful for a person to engage in a pattern of racketeering activity that is connected to the acquisition, establishment, conduct, or control of an enterprise.

*See* 18 U.S.C. § 1962(a)–(d). Thus, the elements common to all claims under RICO are the existence of a person, the existence of an enterprise, and the commission of a pattern of racketeering activity. *See id.*

(a)    All Pro, Chung, Jang, and Porcarello are persons for purposes of RICO.

84.    Congress defined "person," for purposes of RICO, to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  All Pro, Chung, Jang, and Porcarello are all persons for purposes of RICO.

(b)    All Pro, Chung, Jang, and Porcarello operated an enterprise involved in interstate commerce.

85.    Further, "enterprise" is defined broadly to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity.

86.    Samsung is a legal enterprise engaged in and whose activities affect interstate commerce.

87.    All Pro, Chung, Jang, and Porcarello were employed by and associated with Samsung for purposes of the time period in question.

88.    All Pro, Chung, Jang, and Porcarello agreed to and did conduct and participate in the conduct of Samsung's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Samsung.

89.    Acting from within Samsung's otherwise legitimate business operations, and acting outside of their corporate and fiduciary authority, All Pro, Chung, Jang, and Porcarello effectively hijacked Samsung's Services Operations Department and used Samsung to conduct racketeering activities that crossed state lines, thereby establishing the requisite nexus to interstate commerce.

90.     All Pro, Chung, Jang, and Porcarello intentionally defrauded Samsung by offering and accepting bribes and kickbacks in violation of fiduciary duties to Samsung and state and federal law, manipulating subcontract purchase orders issued for parts to Samsung vendors, diverting counterfeit devices to All Pro, manipulating the auctioneer selection process in favor of GAL, manipulating the auction process in favor of All Pro, providing All Pro with Samsung's confidential information, and operating a side business selling misappropriated Samsung parts and equipment. All Pro, Chung, Jang, and Porcarello each served a vital role in the commission of the enterprise's misconduct.

(c)     All Pro, Chung, Jang, and Porcarello conducted a pattern of racketeering offenses enumerated in 18 U.S.C. § 1961(1).

91.     Pursuant to and in furtherance of their purpose to defraud Samsung, All Pro, Chung, Jang, and Porcarello committed multiple related acts of racketeering activity forming the basis of Samsung's RICO claim against All Pro, Chung, Jang, and Porcarello.

92.     By the conduct outlined above, All Pro, Chung, Jang, and Porcarello committed numerous predicate acts of commercial bribery, money laundering, and participation in unlawful monetary transactions. On information and belief, All Pro, Chung, Jang, and Porcarello committed multiple predicate acts of mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and § 1343, respectively.

93.     Pursuant to and in furtherance of their purpose to defraud Samsung, by the conduct outlined above, All Pro, Chung, Jang, and Porcarello committed the following predicate acts:

- Tex. Pen. Code Ann. § 32.43(b) relating to commercial bribery, which provides:

A person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept

any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary.

- 18 U.S.C. § 1956 relating to the laundering of monetary instruments, which makes unlawful:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
(A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .

- 18 U.S.C. § 1957 relating to engaging in monetary transactions in property derived from unlawful activity, which makes unlawful:

(a) Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity

For purposes of money laundering in violation of 18 U.S.C. § 1956, by the conduct outlined above, All Pro, Chung, Jang, and Porcarello committed the following specified unlawful activity:

- 18 U.S.C. § 2320 relating to trafficking in counterfeit goods or services, which makes unlawful:

(a)(1) Whoever intentionally—
(1) traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods and services

94.    All Pro's, Chung's, Jang's, and Porcarello's commission of predicate acts spanned multiple years, are related in purpose, results, participants, victims, and methods of commission, and represent a closed period of repeated conduct. Thus, All Pro, Chung, Jang, and Porcarello's predicate acts constitute a pattern of racketeering activity supporting Samsung's

RICO claim against them. All Pro's, Chung's, Jang's, and Porcarello's commission of these predicate acts constitutes a violation of Sections 1962(a), (c), and (d).

**(ii)      All Pro, Chung, Jang, and Porcarello Violated Section 1962(c)**

95.      To establish a civil claim under Section 1962(c), a plaintiff must prove: (1) the existence of an enterprise that affects interstate or foreign commerce; (2) that the defendant was "employed by" or "associated with" the enterprise; (3) that the defendant conducted or participated in the conduct of the enterprise's affairs; and (4) that the participation was through "a pattern of racketeering activity."

96.      Chung, Jang, Song, and Porcarello were all employees of Samsung during All Pro's, Chung's, Jang's, and Porcarello's commission of the predicate acts. In particular, Chung served as Samsung's Senior Director of Service Operations.  Similarly, Jang was Samsung's Procurement Manager. Finally, Porcarello acted as Samsung's Inventory Control Manager.

97.      Accordingly, in these respective roles and positions, Chung, Jang, and Porcarello clearly possessed significant control within the Samsung's Service Operation Department and held decision-making power sufficient to establish a violation of Section 1962(c).

98.      All Pro was associated with Samsung through a contractual business relationship pursuant to the Distributor Agreement and Accessory Distributor Agreement during Defendants' commission of the predicate acts.

99.      Chung, Jang, and Porcarello, and All Pro conducted and participated in the conduct of Samsung's affairs by conducting an unlawful pattern of racketeering activity from within Samsung's otherwise legitimate business operations.

100.      Through corruption, including the issuance and acceptance of bribery, All Pro, Chung, Jang, and Porcarello usurped Samsung's Service Operations Department and unlawfully

conducted Samsung's operations related to the procurement, repair, and distribution of Samsung parts.  All Pro, Chung, Jang, and Porcarello each acted as a principal player in the overall scheme to defraud Samsung, without whom the scheme would not have been effected.  By the conduct outlined above, these Defendants agreed to and did conduct and participate in the conduct of Samsung's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Samsung.

**C.      Count Three:  Breach of Contract (Against the Employee Defendants).**

101.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

102.    The Employment Agreements are binding and enforceable contracts.

103.    Pursuant to the terms of the Employment Agreements, the Employee Defendants agreed to act in the best interest of Samsung, and to maintain the confidentiality of Samsung's "proprietary or confidential information or know-how belonging to [Samsung], whether or not in written form."

104.    By virtue of their positions with Samsung, the Employee Defendants were in possession of Samsung Telecom's sensitive and highly confidential proprietary business information and trade secrets.

105.    Accordingly, in disclosing such information and in using it for unauthorized purposes, the Employee Defendants breached their express contractual obligations under the Employee Agreements to preserve and protect Samsung's confidential information, and failed to act in the best interests of Samsung Telecom by taking bribes to provide All Pro with preferential treatment.

106.    Pursuant to the terms of the Handbook, the Employee Defendants also agreed not to engage in any business dealings that represent a conflict with the interests of Plaintiff while employed by Samsung.

107.    Accordingly, the Employee Defendants breached the Employment Agreements.

108.    Plaintiffs performed all of their obligations under the Employment Agreements, and any other duties owed to Employee Defendants pursuant to their employment position with Plaintiff.

109.    As a result of the Employee Defendants' material breaches of their contractual duties, Plaintiff has sustained damages in an amount to be determined by the trier of fact.

**D.    Count Four:  Breach of Fiduciary Duties (Against the Employee Defendants).**

110.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

111.    The Employee Defendants owed Plaintiff fiduciary duties, including duties of loyalty, due care, good faith, candor, and full disclosure.

112.    The Employee Defendants breached their fiduciary duties to Plaintiff by, among other things:   (i) misappropriating confidential information, property, and opportunities of Plaintiff for their own benefit; (ii) intentionally diverting business opportunities for their own benefit; and (iii) accepting payments from other persons or entities while employed by Plaintiff.

113.    As a direct and proximate result of the Employee Defendants' breaches of fiduciary duties, Plaintiff has suffered, and continues to suffer, substantial injury, including a loss of profits from the business opportunities diverted, damages incurred as a result of misappropriated parts, and damages to Samsung's image as a result of the distribution of counterfeit Samsung parts, for which Plaintiff now seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined by the trier of fact.

114.    Because the Employee Defendants breached their fiduciary duties intentionally, willfully, wantonly, maliciously, and without justification or excuse, Plaintiff is also entitled to recover punitive damages from the Employee Defendants in an amount to be determined by the trier of fact.

115.    In addition, Plaintiff seeks an order requiring the Employee Defendants to disgorge:  (i) all compensation earned from Plaintiff during the period that they were in breach of his fiduciary duties; (ii) all amounts that the Employee Defendants received from any other person or entity while they were still employed by Plaintiff.

**E.      Count Five:  Aiding and Abetting Breach of Fiduciary Duties (Against All Pro).**

116.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

117.    As alleged above, Employee Defendants breached their fiduciary duties owed to Samsung.

118.    All Pro had knowledge of the fiduciary relationship between certain of the Employee Defendants and Samsung, the employer of Employee Defendants.

119.    All Pro had awareness of its participation in the Employee Defendants' breach of their duty as: (1) All Pro paid bribes to certain of the Employee Defendants; (2) received assembled phone kits comprising of parts belonging to Samsung (including PBAs and OCTAs); and (3) communicated with certain Employee Defendants regarding auction lots and pricing.

120.    Samsung has been damaged as a result of All Pro's aiding and abetting certain of the Employee Defendants' breaches of their fiduciary duties.

**F.      Count Six:  Tortious Interference With Contract (Against All Pro)**

121.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

122.    As fully described herein, Defendants conspired to wrongfully misappropriate Plaintiff's products, and violate certain of the Employee Defendants' contractual obligations and fiduciary duties to Plaintiff.

123.    Samsung had valid and enforceable contracts with its employees, including the Employee Defendants. All Pro willfully and intentionally interfered with Samsung's employment contracts with the Employee Defendants.  Samsung has and will continue to incur substantial damages as a direct and proximate cause of Defendants' tortious interference with Plaintiff's contracts.

**G.      Count Seven:  Civil Conspiracy (Against All Pro, Chung, Jang, and Porcarello).**

124.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

125.    Chung, Jang, Porcarello and All Pro were parties to an unlawful combination and conspiracy.

126.    The object of that unlawful combination and conspiracy was to further the unlawful purposes of:  (i) All Pro providing improper benefits to Chung, Jang, Porcarello in exchange for preferential treatment with respect to parts; (ii) tortiously interfering with Samsung's business opportunities; (iii) misappropriating Samsung's confidential information, including information regarding auctions; (iv) infringing on Samsung's trademarks; (v) breaching fiduciary duties owed to Plaintiff; and (ix) breaching the terms of the Employment Agreements.

127.    The members of this unlawful conspiracy had a meeting of the minds as to the object of their conspiracy.   In particular, Chung, Jang, Porcarello and All Pro agreed and understood that the object of their goal was to commit the wrongful acts detailed above.

128.    Chung, Jang, Porcarello and the All Pro have committed unlawful and overt acts in furtherance of the conspiracy including, but not limited to, approving or otherwise acquiescing in the wrongful conduct described above.

129.    For instance, All Pro and Chung met on two separate occasions for the purpose of planning their conspiracy.   These meetings took place in approximately December 2013 and March 2014.  At each of these meetings, All Pro provided cash payments to Chung in the amount of $5,000.00.   At these meetings, All Pro and Chung had a meeting of minds.   Specifically, at these meetings, All Pro and Chung agreed that in exchange for cash payments, Chung would provide All Pro with improper benefits, including rigging the auctions in favor of All Pro, and to the detriment of Samsung.

130.    Based on this unlawful conspiracy, Plaintiff has been harmed.   Accordingly, Plaintiff seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined by the trier of fact.

131.    Because the acts pursuant to the conspiracy were committed knowingly, willfully, maliciously, fraudulently, and with gross negligence, Plaintiff also seeks to recover punitive damages in an amount to be determined by the trier of fact.

**H.    Count Eight:  Misappropriation Under the Texas Trade Secrets Act (Against All Pro, Chung, Jang, and Porcarello).**

132.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

133.    Under Texas law, a plaintiff can recover for misappropriation of trade secrets by establishing (1) the existence of proprietary information or a trade secret, (2) a breach of a confidential relationship or improper discovery of the information or secret, (3) a use of the information or secret without the plaintiff's authorization, and (4) resulting damage.

134.    Plaintiff's pricing strategy and its cost of assembling phones are trade secrets and/or confidential information of Samsung.  Samsung strictly prohibits the use of build kits and unauthorized third parties to assemble its phone because doing so would allow others to ascertain the price at which it costs Samsung to create a phone. The third party than wrongfully purchased complete build kits from Chung, Jang, and Porcarello. These build kits included PBAs and OCTAs, items that are prohibited for sale on the open market.  This prohibition, in effect, prevented distributors from buying parts themselves and assembling them. As a result, the cost of assembly was not known to the general public because the distributors could not assemble complete Samsung phones without the OCTAs and PBAs.

135.    From there, the third party assembled the phones.  All Pro, knew or had reason to know, that these assembled phones were derived from or through a person who had utilized improper means to acquire it because All Pro knew Samsung was not the source of the assembled phones and only Samsung could sell All Pro new Samsung phones. All Pro secured this confidential information through improper means, namely bribery.

136.    Additionally, with respect to the auction, All Pro would receive advance knowledge of the auction from Chung, Porcarello and others before other bidders were provided this information.  This information included information about the products and models to be auctioned and the starting bids. This information gave All Pro the ability to pre-sell the parts it bought at auction, thereby eliminating its risk and undercutting the market and the profit

Samsung made on the parts auctions.  All Pro knew or had reason to know that this information was improperly acquired as it was not available to the general public.  All Pro secured this confidential through improper means including bribery.

**I.     Count Nine:  Attorneys' Fees**

137.    Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

138.    Pursuant to Section 38.001, *et seq.* of the Texas Civil Practice and Remedies Code, and pursuant to RICO, Plaintiff is entitled to reimbursement of its reasonable attorneys' fees incurred as a result of bringing this action.

## VI.

## <u>JURY DEMAND</u>

139.    Plaintiff requests that a jury be convened to try the factual issues in this case.

## VII.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff requests that Defendants be cited to appear and answer the foregoing complaint and, that on final trial, the Court enter judgment for Plaintiff and against Defendants and award Plaintiff the following relief:

a.     actual, compensatory consequential, and punitive damages;

b.     disgorgement of the ill-gotten gains that Defendants earned or otherwise obtained through their unlawful conspiracy;

c.     reasonable attorneys' fees and costs of court;

d.     permanent injunctive relief;

e.     pre-judgment and post-judgment interest at the highest lawful rates; and

f.      such additional relief, at law and in equity, to which Plaintiff may be justly
entitled.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**


By:   */s/ Benjamin L. Riemer*                            _____
Jeffrey J. Ansley
State Bar No. 00790235
jansley@bellnunnally.com
Jeffrey S. Lowenstein
State Bar No. 24007574
jlowenstein@bellnunnally.com
Benjamin L. Riemer
State Bar No. 24065976
briemer@bellnunnally.com

3232 McKinney Avenue, Suite 1400
Dallas, Texas 75204-2429
(214) 740-1400 Telephone
(214) 740-1499 Facsimile

**ATTORNEYS FOR PLAINTIFF
SAMSUNG ELECTRONICS AMERICA,
INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2017, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record. Additionally, a copy was sent to Yang Kun "Michael" Chung *via* email at ykchung111@gmail.com.

/s/ Benjamin L. Riemer
Benjamin L. Riemer

3347388_1.docx / 10133.1